## SUPREME COURT OF JUDICATURE

OF THE

## STATE OF VERMONT.

---

RUTLAND COUNTY, JULY ADJOURNED
TERM, A. D. 1802.

---

*JONATHAN ROBINSON*, Chief Judge.
*ROYALL TYLER*, } *Assistant Judges.*
*STEPHEN JACOB*, }

---

STEPHEN WINDOVER and JOSEPH HOPKINS,
Appellees,
*against*
JOHN ROBBINS, Appellant.

THE plaintiffs, as merchants trading in company, declare in trespass on the case, that at the city of *New-York*, on the 27th of *November*, 1795, one *James Robinson* was indebted to them in the sum of 144*l*. 2*s*. 11*d*. *New-York* currency, balance due from said *Robinson*, on account of goods, &c. sold to him. That *Robinson* was then, and ever since hath been, a bankrupt, which was unknown to the plaintiffs, and well known by the defendant. That the defendant conspiring with *Robinson* to defraud the

An action will lie for the advancing money to a bankrupt, with intent and to enable him to obtain on a credit, merchandise which goes into possession of the lender, although the plaintiff never had any view or even knowledge of the defendant.

VOL. II.                    1

plaintiffs, and to procure the plaintiffs to sell to *Robinson* on credit, goods, wares, and merchandise, to the amount of 610*l.* 11*s.* 10*d.* *New-York* currency, did advance *Robinson*, as of his own proper moneys, the sum of 320*l.* of the same currency, with intent that *Robinson* should be able to pay the plaintiffs the sum due to them, and to purchase of them goods to the amount of 610*l.* 11*s.* 10*d.* as aforesaid, the residue of said 320*l.* going in part and prompt payment towards said goods. That the said *James Robinson*, conspiring as aforesaid, on the 20th of *November*, 1795, did, in the said city of *New-York*, apply to the plaintiffs to vend him goods to the amount of 610*l.* 11*s.* 10*d.* and did then and there promise and offer to advance the plaintiffs, in hand, 320*l.* as aforesaid, to pay the above balance of 144*l.* 2*s.* 11*d.* and towards the amount of the goods so to be sold, on condition that the plaintiffs would give credit and a day of payment for the remainder, or balance to be due for said goods, &c. amounting to the sum of 434*l.* 4*s.* 9*d.* of the same currency, equal in value to the sum of 1,086 dols. 84 cts. of the current moneys of the *United States.* Whereupon the plaintiffs, deceived by the conspiracy and fraud of the said *Robbins* and *Robinson*, did sell and deliver to the said *James Robinson*, goods, wares, and merchandise, to the said amount of 610*l.* 11*s.* 10*d.* and the plaintiffs then and there received of said *James Robinson* the said sum of 320*l.* in full discharge and payment of said balance due them upon said former account, amounting to the said sum of 144*l.* 2*s.* 11*d.* and in part payment of said sum of 610*l.* 11*s.* 10*d.* and did then and there credit the said *James Robinson* for the balance then due,

amounting to the sum of 434*l*. 4*s*. 9*d*. as aforesaid, to be paid to them when he the said *James Robinson* should be thereto requested. And the plaintiffs in fact say, that the said *James Robinson*, conspiring as aforesaid, and in pursuance of the fraudulent combination with the defendant as aforesaid, having so received said goods, &c. of the plaintiffs, then and there forthwith delivered the same to the defendant for his the defendant's sole use and benefit, and that the defendant then and there forthwith received the same, and hath converted them to his own proper use. And the plaintiffs in fact further say, that the said *James Robinson* has never since been able to pay to them the aforesaid sum of 434*l*. 11*s*. 10*d*. *New-York* currency, nor any part thereof, although often thereunto requested and demanded. Wherefore the plaintiffs say, that by the fraudulent and deceitful conduct of the defendant, combining and conspiring with the said *James Robinson*, they have been injured, *ad damnum*, 2,000 dollars.

General issue joined, and put to the Jury.

In support of the declaration, the plaintiffs' counsel offered to show in evidence *the confessions of James Robinson to prove the conspiracy*.

The defendant's counsel objected, That *James Robinson* was not a party to the suit; and if he were, his confessions ought not to prejudice the defendant. That if it should be understood to have been the decision of the Court, that *Robinson's* acts or words were admitted in evidence to charge the defendant, it would follow that a plaintiff might hereafter maintain an action for the most aggravated fraud against

Windover and Hopkins v. Robbins.

the most honest man, merely by coupling him in his declaration with a villain, and showing the confessions of the latter to charge the former.

*In an action of deceit, in nature of a conspiracy, the acts or speeches of an alleged particeps in the fraud cannot be admitted in evidence to the Jury until a privity between him and the defendant is first shown, to the satisfaction of the Court. But when proved, the most liberal latitude will be allowed in showing the conduct and confessions of the particeps.*

*Sed per Curiam.* This is an action of deceit in nature of a conspiracy brought against *John Robbins*, and *James Robinson* is alleged to have been his agent in the fraud. The uniform practice of the Court in similar cases has been, to call upon the plaintiff to show a privity between the defendant and the person coupled with him in the fraud. The Court will decide whether this be sufficiently proved or not. Until it is proved, the confessions or acts of the alleged agent in the fraud cannot be admitted. At present, therefore, the confessions of *Robinson* cannot be shown to the Jury. Let the plaintiffs proceed to prove the *privity*, and when shown to the satisfaction of the Court, the most liberal latitude will be allowed in the proof of the conduct and confessions of *Robinson* as a *particeps*.

On the trial by the Jury, it appeared in evidence,

That on the 27th of *November*, 1795, *James Robinson*, then a bankrupt, was indebted to the plaintiffs 144*l.* 2*s.* 11*d. New-York* currency.

That in *October* preceding, the defendant, then an inhabitant of *Rutland*, observed to Messrs. *Willoughby & Miller*, that he could procure goods at ten shillings on the pound, if *he dared to risk somebody.* When requested to explain, he said, after some hesitation, perhaps it is by letting a man have money to establish a credit at the different banks.

That in *November*, 1795, the defendant and *James Robinson*, long known to the former as a bankrupt,

went to the city of *New-York* in company. The defendant there told a witness that he had concluded to let *Robinson* have 1,500 dollars, and that he was to have 100*l.* as a premium, and double the amount in goods as his security.

On the 27th of *November*, 1795, *Robinson*, by advancing to the plaintiffs 320*l. New-York* currency, extinguished the debt of 144*l.* 11*s.* 2*d.* then due, and the balance was passed to his credit on amount of goods and merchandise sold and delivered to him at that time, the invoice of which footed at 610*l.* 11*s.* 10*d.* and after deducting the credit, balanced in favour of the plaintiffs, 434*l.* 4*s.* 9*d.*

The goods were packed, and the bales marked *J. R.* Before they were removed, a bill of sale from *Robinson* to the defendant was endorsed upon the invoice. When the bales were shipped, they were delivered to the defendant, who with chalk, to the initials of *J. R.* added *obbins*. They were conveyed by the defendant to *Clarendon, Rutland* County, and exposed for sale in a store occupied by *Robinson* ostensibly as his property; but the defendant officiated as his clerk.

A dispute soon happened between *Robinson* and the defendant on account of the former paying sundry debts from these goods. In their altercation the defendant stated the contract between them, viz. "that he and his horses were to be at the service of *Robinson* from *October*, 1795, to the *May* following; that he was to receive 100*l.* lawful money, and to have goods pledged for his security; that he had advanced 1,500 dollars; and they had further agreed that the goods purchased by *Robinson* in *New-York* from the plaintiffs and others, amounting in value, at

the *New York* prices, to upwards of 6,000 dollars, should be pledged with him; conditioned, that if *Robinson*, by the 20th of *May*, 1786, paid the 100*l.* and repaid the 1,500 dollars, with all expenses and incidental charges, he was to surrender his lien on the goods; otherwise they were to become his absolute property." *Robinson* did not deny the contract, but complained that it was a hard bargain. An accommodation then took place. The defendant gave *Robinson* 500 dollars, who relinquished all claim on the goods. The defendant took them into possession, and converted them to his own use. *Robinson* the next day absconded the State.

The only points in defence were,

That as the plaintiffs, during the whole transaction, never had any view or even knowledge of the existence of the defendant, it could not be intended that they parted with their property through any reliance upon him.

That the defendant's loaning money to *James Robinson*, to buttress his declining credit, so far from being a fraudulent, was a lawful and meritorious act; that this was frequently done by the fairest merchants, and often operated a substantial benefit to creditors by saving a failing trader from bankruptcy. In support of this the defendant's counsel cited 2 *Burr. Rep.* p. 933. *Foxcraft et al. Assignees of Satterthwaite, bankrupt, v. Devonshire et al.* wherein Lord *Mansfield,* in delivering the opinion of the Court of King's Bench, observed : " A notion, ' that lending money to traders, knowing them to be in dubious, tottering or distressed circumstances, upon mortgages or *liens,* is fraudulent, and consequently the contract void in case a bankruptcy ensues,' would

throw all mercantile dealing into inextricable con- <span style="float:right">Windover and<br>Hopkins<br>v.<br>Robbins.</span>
fusion. Men lend their money to traders upon
mortgages or consignment of goods, because they
suspect their circumstances, and will not run the
risk of their general credit."

TYLER, Assistant Judge, in charge to the Jury, laid
it down as settled, that where *A.* and *B.* combine to
defraud *C.* of property, and it is carried into effect,
though *A.* should keep concealed from *C.* during
the whole transaction, and *B.* should be the active
partner in the conspiracy, yet the fraudulent combi-
nation being proved to have existed between them,
*A.* shall be charged in damages; for it may appear
that the *summa ars* of the covin was to secret *A.*
from the knowledge of *C.* An adverse doctrine
would lead to the conclusion, that the grossest fraud
might be practised and fully proved in our courts of
justice, and the law be found inadequate to relieve.
But the arm of the law is not shortened, that it can-
not save, and courts and jurors will with eagle eyes
trace fraud through all its secret and crooked paths,
and render both the agent who appears, and the
prime mover who plots in darkness, amenable.

The case cited from *Burrow*, addressed to the
Court, but read in presence of the Jury, he declared
to be not in point.

The defendants in that case had honoured certain
bills and drafts made upon them by *Satterthwaite.*
Afterwards, effects of this bankrupt came into their
possession by his assignment, which they sold and
converted into money; and the question was, whe-
ther this money should become the trust property of
his assignees, or go to remunerate the defendants for

the bills and drafts they had accepted and paid. It appears, that these bills and drafts were accepted and paid by the defendants before the commission of bankruptcy, which was in *August*, 1752.

The defendants were to receive merely the amount of what they had advanced with the customary commissions. Some secret acts of bankruptcy committed by *Satterthwaite*, about *Christmas*, 1751, were attempted to be proved by the plaintiffs, which " overreached the consignment of the goods, the sale of them, the receipt of the moneys for which they were sold, and likewise the time when the defendants advanced the moneys to the use and order of the bankrupt;" and the fraud attempted to be charged upon the defendants was this, " that they were privy to *Satterthwaite's* insolvency, at the time when they advanced the money to discharge his bills." But all this was done away by counter proof; it appearing, that if any of these secret acts of bankruptcy existed, they were done away by his again appearing publicly as usual, and continuing so to do, until *August*, 1752, when he stopped payment, and the commission was taken out.

If such secret acts of bankruptcy in *Satterthwaite* had been proved, and within the knowledge of the defendants, it is probable the decision would have been adverse, and the transaction amounted to a fraud in law, at least; or if the consignment of the goods, the sale of them, the receipt of the moneys for which they were sold, and likewise the time when the defendants advanced the moneys to the use and order of the bankrupt, had all been subsequent to the taking out of the commission of bankruptcy, the question must have turned upon the validity of

payment, under the act of 19 *Geo.* II. c. 32. without noticing several other points mooted by the learned counsel. The question decided in that cause was simply, whether payment of bills to support the credit of a declining trader, without notice of bankruptcy, be fraudulent.

We should not consider it so here, for the law should always aid rather than discountenance the social virtues.

But does the case, or the reason of the decision, apply? Here is a premeditated *fraud in fact,* of the grossest nature, alleged.

It is in proof that the defendant *Robbins,* a few weeks before the plaintiffs vended their merchandise to *Robinson,* declared his intention of defrauding *somebody.* He said he could obtain goods at half their real value. He detailed his iniquitous scheme, which was by loaning money to some one who might thereby obtain a credit. He did not indeed say he intended to loan to a bankrupt, but he described him as an unresponsible man; for he added, " if he could venture to trust somebody."

He had been long and familiarly acquainted with *Robinson,* and knew he was bankrupt. He accompanied him to *New-York.* He advanced him 1,500 dollars, part of which money it is not contended was paid by *Robinson* to the plaintiffs, and was the inducement for them to give him a credit to a large amount. Before the goods purchased by *Robinson* were removed from the plaintiff's store, this defendant took a bill of sale of the whole invoice. When the property is shipped, the defendant takes it into his possession, and marks his name upon the packages. Under his care the goods were transported to

Windover and
Hopkins
v.
Robbins

*Clarendon.* They were, it is true, exposed to sale in the store occupied by *Robinson;* but the defendant officiated as clerk, and evidenced his interest in and control over the property, by restraining his ostensible principal from applying any part of them to the payment of his debts. A dispute happened, and terminated in a final accommodation, by which *Robinson,* in consideration of 500 dollars, relinquished his claim to the whole merchandise in the store, which included not only the goods purchased of the plaintiffs, but other goods to the amount of more than 6,000 dollars, obtained by *Robinson* in the same mode and time from others. The defendant took possession of the whole, and *Robinson* immediately absconded.

Does the case read from the *English* authority apply? By advancing money to *James Robinson,* was the defendant engaged in the laudable business of loaning his money to support the credit of a declining trader without notice of any act of bankruptcy?

Verdict for the plaintiffs, 1,556 dols. 58 cts.

*Darius Chipman* and *John Cook,* for plaintiffs.
*Cephas Smith, Chauncey Langdon,* and *Smith &* *Prentice,* for defendant.